**In re HUFFY CORPORATION, et al., Debtors.**

**Mark S. Stickel, Trustee, Plaintiff,**

**v.**

**Kenneth Finkelstein, et al., Defendants.**

Bankruptcy Nos. 04–39148 to 04–39167.
Adversary No. 06–3127.

United States Bankruptcy Court,
S.D. Ohio,
Western Division at Dayton.

Dec. 21, 2006.

Kim Martin Lewis, Dinsmore & Shohl LLP, Donald W. Mallory, Cincinnati, OH, Stewart Hamilton Cupps, Kegler Brown Hill & Ritter LPA, Columbus, OH, for Debtors.

M. David Bryant, Dallas, TX, Ronald S. Pretekin, Coolidge Wall Co. LPA, Dayton, OH, Thomas Rice, San Antonio, TX, for plaintiff.

Sherri Blank Lazear, Baker & Hostetler LLP, Columbus, OH, Nathan A. Wheatley, Cleveland, OH, for defendants.

## DECISION ON MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION

LAWRENCE S. WALTER, Bankruptcy Judge.

This adversary proceeding was commenced on March 17, 2006 with the filing

of a complaint by Mark S. Stickel, Trustee of the Huffy Recovery Trust ("Trustee"), against several Canadian defendants. The multiple-count complaint seeks damages and equitable relief under a variety of theories of which fraudulent transfer, breach of fiduciary duty, and constructive fraud predominate. Currently before the Court are two motions to dismiss the adversary proceeding for lack of personal jurisdiction ("Motion(s) to Dismiss") together with a plethora of responsive memoranda.

One Motion to Dismiss was filed by Defendants Kenneth Finkelstein, James Salter, Rick White, and Osgoode Financial, Inc. ("Finkelstein Defendants") on July 7, 2006 (doc. 19). In support of their Motion to Dismiss, the Finkelstein Defendants filed the affidavits of Kenneth Finkelstein, James Salter, and Rick White. In support of their Reply Memorandum (doc. 49), the Finkelstein Defendants filed additional affidavits by Kenneth Finkelstein and James Salter. The other Motion to Dismiss was filed by The Forzani Group Ltd. ("Forzani Group") on July 10, 2006 (docs. 23 & 24). The Forzani Group filed an affidavit of Robert Sartor in support of its motion. For convenience, the Court will sometimes refer to the Finkelstein Defendants and Forzani Group jointly as the "Defendants."[1]

In responding to the Defendants' Motions to Dismiss, the Trustee filed the Huffy Corporation's ("Huffy") verified responses to the Trustee's First Request for Admissions ("Admissions"). The Admissions provide evidentiary support for the Trustee's responses. The Defendants separately moved to strike the Admissions due to alleged violation of Fed. R. Bankr.P. 7036, which makes Fed.R.Civ.P. 36 applicable in adversary proceedings.

Responding to the Defendants' objections to the Admissions, the Trustee filed supplemental responses (docs. 62 & 63) to each of the Motions to Dismiss ("Supplements"), to which he attached affidavits of Nancy A. Michaud, Huffy General Counsel and Secretary, and John A. Muskovich, Huffy Chief Executive Officer (jointly referred to as the "Huffy Affidavits") that substantially duplicated the information contained in the prior verified Admissions. The Defendants also filed Motions to Strike the Supplements (docs. 69, 70 & 72).

By Order dated October 12, 2006 (doc. 73), the Court denied the motions to strike the Admissions as well as the motions to strike the Supplements. Consequently, although largely duplicative, the facts set forth in both the Admissions and the Huffy Affidavits remain for consideration by the Court. The Court may also consider the factual allegations set forth in the complaint and other written submissions.

To survive a motion to dismiss for lack of personal jurisdiction, it is only necessary for a plaintiff to present through his pleadings and affidavits a *prima facie* case for jurisdiction. *Kerry Steel, Inc. v. Paragon Industries, Inc.*, 106 F.3d 147, 149 (6th Cir.1997); *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir.1991). The Court must view the affidavits, pleadings, and related documentary evidence in the light most favorable to the plaintiff. *Kerry Steel*, 106 F.3d at 153; *Market/Media Research, Inc. v. Union Tribune Pub. Co.*, 951 F.2d 102, 104 (6th Cir.1991), *cert. denied*, 506 U.S. 824, 113 S.Ct. 79, 121 L.Ed.2d 43 (1992). However, the court is not precluded from considering "undisputed factual representations of the defendant which are consistent with the representations of the plaintiff." *Kerry Steel*, 106

---

**1.** One defendant, Gen–X Sports, Inc., filed an answer to the complaint rather than a motion to dismiss, and is therefore not affected by this decision.

F.3d at 153. The recitation of facts that follows is consequently derived primarily from the Huffy Affidavits and Admissions and the Trustee's pleadings, appropriately supplemented by undisputed and consistent representations contained in the affidavits filed by the Defendants.[2]

### Jurisdictional Facts

Prior to its chapter 11 filing on October 20, 2004, Huffy was a major international seller of bicycles, sporting goods, and related goods and services based in Miamisburg, Ohio.[3] It operated through several wholly-owned subsidiaries, including some incorporated in Canada.

In 2002, Defendant Kenneth Finkelstein ("Finkelstein") was Chief Financial Officer and Defendant James Salter ("Salter") was Chief Executive Officer of Gen–X Sports, Inc., an Ontario corporation, and Gen–X Sports, Inc., a Delaware Corporation (jointly referred to as "Gen–X").[4] They were also the principal Gen–X shareholders. Both men are Canadian residents who own no property and have no permanent presence in the United States. Another "substantial" shareholder was the Forzani Group, a major publicly traded sporting goods company located and incorporated in Canada.[5] Gen–X was a provider of skis, snowboards, and other sporting goods and also had an "Opportunities Business" or "OPP Business" that acquired sporting goods at deep discounts and then resold them.

On or about April 25, 2002, Finkelstein and Salter attended Huffy's annual shareholder meeting in Dayton, Ohio for the purpose of presenting to the Huffy Board of Directors a possible acquisition of Gen–X. In September of 2002, Huffy purchased Gen–X, including the OPP Business and the United States trademark "Gen–X," and paid its owners (including Finkelstein, Salter, and Forzani Group) consideration of approximately $19 million cash and roughly $26 million in stock ("2002 Gen–X Transaction").

As a result of the 2002 Gen–X Transaction, Finkelstein and Salter became shareholders of Huffy. They continued to operate Gen–X Sports, Inc. (the U.S. subsidiary) and the Canadian Gen–X subsidiary (renamed Gen–X Sports Canada, Inc.) as Huffy corporate officers. This business was conducted in both Canada and the United States. They executed Employee Retention Agreements with Huffy. The Employee Retention Agreements contained Ohio choice of law provisions and rewarded Finkelstein and Salter with additional shares of Huffy stock that vested on subsequent anniversaries of their employment with Huffy.

As officers of the Huffy subsidiaries, Finkelstein and Salter were responsible to the subsidiary board of directors com-

---

2. Consequently, the recited facts do not constitute final findings of fact for any other purpose including trial or other dispositive motions. Likewise, nothing herein constitutes a final legal conclusion or merit determination except with respect to personal jurisdiction.

3. Huffy remained in business following confirmation of its plan of reorganization in 2005, but the operative facts in this proceeding occurred prior to confirmation.

4. Neither of these referenced corporations with the name Gen–X Sports, Inc. is the Ontario corporation with the same name that is a defendant in this adversary proceeding. The defendant corporation was originally named 129506 Ontario Limited and became Gen–X Sports, Inc. after closing of the 2004 OPP Transaction as explained later in this decision.

5. The adjective "substantial" is used by the Trustee. Forzani indicates that it owned 7% of the shares.

prised of Robert W. Lafferty, the Chief Financial Officer of Huffy Corporation, and Nancy A. Michaud, Vice President and General Counsel of Huffy Corporation, both of Miamisburg, Ohio. After September of 2003 until roughly March of 2004, Finkelstein and Salter served as officers of the Huffy-owned Gen–X OPP Business and worked on potential acquisitions for Huffy, reporting directly to the Huffy CEO in Miamisburg, Ohio. The affidavit of Ms. Michaud recounts several specific instances between September of 2002 and early 2004 where one or both of the Canadians attended Huffy Senior Management Conferences or Board of Directors Meetings in the United States, usually in person, but occasionally via telephone. They also submitted some expense reports to Huffy during the same period seeking reimbursement for business-related expenses that were incurred in various states. They were also in frequent contact by telephone, correspondence, and email with Huffy personnel in Ohio during their tenure as Huffy officers. This included recourse to Huffy personnel with respect to legal, human resources, employee benefits, and taxation matters.

On February 10, 2003, Defendant Rick White ("White") executed an Employment Agreement with Gen–X Sports Canada, Inc. (the Huffy subsidiary) pertaining to his employment as Senior Vice President of the Gen–X OPP Business and Volant Ski.[6] White is a Canadian resident and his Employment Agreement was governed by the laws of the Province of Ontario. Thereafter, White increasingly assumed responsibility for certain operations of these businesses. He was in frequent contact with Huffy personnel in Ohio via telephone, correspondence, and e-mail. He

also had discussions with the Huffy Board regarding strategic opportunities with the ski division, including an exit strategy.

During the second half of 2003, Finkelstein and Salter engaged in discussions with Huffy's CEO regarding their futures with Huffy, including their plans to purchase for themselves a retail footwear chain of stores in California. These discussions resulted in Finkelstein and Salter signing a letter agreement with Huffy on November 3, 2003 that redefined their roles with the company. Henceforth, through their departure at the end of 2004, they were to focus their efforts on the OPP Business and on potential mergers and acquisitions for Huffy, with some allowance for their independent business activities.

In December of 2003, Finkelstein and Salter began discussions and negotiations with Huffy representatives, primarily with Paul D'Aloia, its President, regarding their proposed purchase of the OPP Business from Huffy (the "2004 OPP Transaction"). As the negotiations progressed, it was disclosed that White would also be part of the purchasing group and that the purchase would be financed in part through an entity that they controlled. The details of the 2004 OPP Transaction and resulting terms of the Asset Purchase Agreement ("APA") were conducted primarily by telephone and electronic transmission of documents between Huffy executives and attorneys in Ohio and the Finkelstein Defendants and their attorneys in Canada.

The APA, dated March 19, 2004, was specifically governed by Ohio law. The purchased assets included the OPP business and the U.S. trademarks related to

---

**6.** In his affidavit, Mr. White claims that he has "never been an officer ... of Gen–X Sports Canada, Inc., a Canadian corporation, or any affiliate or subsidiary of the Huffy Corporation." However, that assertion is contradicted by Ms. Michaud's affidavit and the specific terms of the Employment Agreement executed by Mr. White.

"Gen-X." The seller under the APA was Gen-X Sports Canada, Inc. and its corporate parent, Huffy. The purchaser was 1294506 Ontario Limited, an Ontario Corporation, which later became Gen-X Sports, Inc. ("New Gen-X"). Finkelstein, Salter, and White also signed the APA as the owners of New-Gen-X. The only other signatory to the APA was Defendant Osgoode Financial, Inc., an Ontario corporation controlled by Finkelstein and Salter ("Osgoode"). Osgoode had participated in the negotiations leading up to the 2004 OPP Transaction but did not have separate counsel from Finkelstein, Salter, and White. Osgoode executed the APA solely with respect to Section 8.06 thereof which pertained only to a supplier agreement between Osgoode and Gen-X Sports Canada, Inc. ("Supplier Agreement"). This short section merely terminated the Supplier Agreement as of the APA closing date and limited the liability of Huffy and Gen-X Sports Canada, Inc. under the Supplier Agreement to products listed on an attached schedule and shipped prior to the closing date.[7]

On March 18, 2004, prior to closing of the 2004 OPP Transaction, Defendants Finkelstein, Salter, and White entered into an agreement with Forzani Group (the "Forzani Agreement") to sell to Forzani Group all of the shares of New Gen-X once the purchase of the OPP Business from Huffy was completed.[8] In fact, Forzani Group supplied all of the financing necessary to complete the 2004 OPP Transaction. Consequently, the day after the 2004 OPP Transaction had closed, Forzani Group acquired all the stock of New Gen-X which now owned the OPP Business and the U.S. Trademarks. Finkelstein and Salter (and perhaps White) then continued to operate the same business for Forzani Group.

In an unrelated transaction, shortly after Huffy filed for bankruptcy protection, Huffy negotiated an asset purchase agreement with Forzani Group by which Forzani Group would purchase certain of Huffy's assets, subject to higher bids. The proposed agreement and bid procedures were approved by this court and the auction occurred on December 10, 2004 in Cincinnati, Ohio. Salter traveled to Ohio and was present at the auction on behalf of Forzani Group. Forzani Group was the winning bidder and the Court entered an order approving the sale on December 14, 2004. Forzani Group has continued to purchase goods from Huffy since Huffy's emergence from bankruptcy in 2005.

Either directly or indirectly through its subsidiaries, Forzani Group owns several

7. The Trustee's complaint and memoranda contain some inconsistent and vague suggestions that Osgoode was part of the purchasing group, was to be a financer of the 2004 OPP Transaction, and was one of the parties that negotiated the "Forzani Agreement" with Forzani Group. However, no details are provided and there is nothing in the affidavits or Admissions either specific or general to support these propositions. Furthermore, the APA clearly shows that Osgoode was not a purchaser and was only the subject of a single paragraph pertaining to a Supplier Agreement. It is also undisputed that Forzani Group financed the entire transaction.

8. The Trustee alleges that Huffy was not informed of the Forzani Group's involvement in this transaction until after it was consummated, but this ignorance is not substantiated in any way in the Admissions or supporting affidavits. The Finkelstein Defendants dispute that Huffy was completely unaware of Forzani Group's financial interest. Mr. Finkelstein states in his affidavit that, no later than a week prior to execution of the APA, he informed Robert Lafferty, a director of Gen-X Sports Canada, Inc., that Forzani Group would be the "financial partner" for 1294506 Ontario Limited in the transaction. Mr. Salter states in his affidavit that he provided the same information at approximately the same time to Paul D'Aloia, the President of Huffy.

retail sporting goods chains and wholesale enterprises, and also administers a group of retail franchises. All of these businesses are located in and do business almost exclusively in Canada. Forzani Group has no offices, warehouses, or distribution centers within the United States. It does not own any real estate within the United States and has not registered with any Secretary of State or become licensed to do business in the United States. It does not maintain any bank accounts or telephone numbers, or advertise within the United States. With the exception of the bankruptcy sale proceeding referenced above, Forzani Group has never submitted to the jurisdiction of any United States court. Nevertheless, Forzani Group does have some commercial contacts with the United States. It owns a subsidiary incorporated in Delaware which is currently inactive. A very small amount of its products are sold to United States customers, most of whom must pick up their purchases in Canada. Its employees sometimes attend trade shows in the United States and meet with American affiliates of Forzani Group's Canadian suppliers.

### Legal Analysis

When a federal court sits with federal question jurisdiction and exercises personal jurisdiction pursuant to a national service of process provision, its jurisdiction is nationwide, and the court need not rely on the forum state's long arm statute to establish jurisdiction over parties outside the forum state. *Medical Mutual of Ohio v. deSoto*, 245 F.3d 561, 567 (6th Cir.2001);

*In re Chari*, 276 B.R. 206, 210 (Bankr. S.D.Ohio 2002). "In other words, when a federal court exercises jurisdiction pursuant to a national service of process provision, it is exercising jurisdiction for the territory of the United States and the individual liberty concern is whether the individual over which the court is exercising jurisdiction has sufficient minimum contacts with the United States." *deSoto*, 245 F.3d at 567–568.

In the bankruptcy context, nationwide service of process is provided by Fed. R. Bankr.P. 7004(d) and corresponding personal jurisdiction is conferred by Fed. R. Bank. P. 7004(f).[9] Numerous courts have recognized the constitutional legitimacy of this rule. *See, e.g., In re Federal Fountain, Inc.*, 165 F.3d 600, 601 (8th Cir.1999) ("We believe that certain elementary legal principles that have enjoyed widespread acceptance for a significant period of time provide a firm foundation for the proposition that Fed. R. Bankr.P. 7004(d) is a constitutional exercise of congressional authority."). Consequently, assuming proper service and subject matter jurisdiction, a bankruptcy court need not examine a defendant's "minimum contacts" with the forum state. Instead, "only a federal 'minimum contacts' test is required, whereby the Fifth Amendment's Due Process Clause limits a bankruptcy court's exercise of personal jurisdiction over a defendant." *Enron Corp. v. Arora (In re Enron Corp.)*, 316 B.R. 434, 444 (Bankr.S.D.N.Y.2004). *See also, In re*

---

9. Fed. R. Bankr.P. 7004

(d) NATIONWIDE SERVICE OF PROCESS. The summons and complaint and all other process except a subpoena may be served anywhere in the United States.
* * *
(f) PERSONAL JURISDICTION. If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service in accordance with this rule or the subdivisions of Rule 4 F.R.Civ.P. made applicable by these rules is effective to establish personal jurisdiction over the person of any defendant with respect to a case under the Code or a civil proceeding arising under the Code, or arising in or related to a case under the Code.

*Tipton,* 257 B.R. 865, 872–873 (Bankr. E.D.Tenn.2000) and cases cited therein.

 The broad precepts governing this court's constitutionally permitted exercise of personal jurisdiction have been frequently recited:

> The Due Process Clause requires that the exercise of personal jurisdiction in each case comport with "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 342–43, 85 L.Ed. 278 (1940)). In broad terms, the assertion of personal jurisdiction satisfies due process if "the defendant purposefully avails itself of the privilege of conducting activities within the forum State," *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958), such that it "should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

*Nationwide Mutual Insurance Co. v. Tryg International Insurance Co., Ltd.,* 91 F.3d 790, 793 (6th Cir.1996).

 Personal jurisdiction may be either general or specific. *Id.* General jurisdiction may be found where a defendant has "continuous and systematic contacts with the forum state sufficient to justify the state's exercise of judicial power with respect to any and all claims" against the defendant. *Kerry Steel,* 106 F.3d at 149; *Aristech Chemical International Limited v. Acrylic Fabricators Limited,* 138 F.3d 624, 627 (6th Cir.1998). A state could exercise general jurisdiction over a defendant "even if the action is unrelated to the defendant's contacts with the state." *Third National Bank in Nashville v. WEDGE Group Inc.,* 882 F.2d 1087, 1089

(6th Cir.1989), *cert. denied,* 493 U.S. 1058, 110 S.Ct. 870, 107 L.Ed.2d 953 (1990). Specific jurisdiction, on the other hand, pertains only to those "claims that 'arise out of or relate to' a defendant's contacts with the forum." *Kerry Steel,* 106 F.3d at 149 (quoting *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414–415 & n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). Unlike general jurisdiction, specific jurisdiction might be appropriate based upon just a single act of the defendant, depending upon the nature and quality of the act and the surrounding circumstances. *Nationwide,* 91 F.3d at 794.

 In the Sixth Circuit, a three-part test serves as an analytical starting point for determining the existence of specific personal jurisdiction:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Southern Machine Company, Inc. v. Mohasco Industries, Inc.,* 401 F.2d 374, 381 (6th Cir.1968). Each factor or criterion is an independent requirement such that all three must be met to invoke personal jurisdiction. *LAK, Inc. v. Deer Creek Enterprises,* 885 F.2d 1293, 1303 (6th Cir.1989), cert. denied, 494 U.S. 1056, 110 S.Ct. 1525, 108 L.Ed.2d 764 (1990). "Purposeful availment" is the preeminent factor to be considered. *Kerry Steel,* 106 F.3d at 150. The court's careful consideration of the substantiality of the defendant's relationship to the forum "ensures that a defendant will not be haled into a jurisdiction

solely as a result of 'random,' 'fortuitous' or 'attenuated' contacts." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *LAK*, 885 F.2d at 1300.

■ The second or "arising from" factor essentially requires that the "cause of action ... have a substantial connection with the defendant's in-state activities." *Southern Machine*, 401 F.2d at 384 n. 27. It is a fairly lenient standard that has been met even where the operative facts are only marginally related to the alleged in-state contacts. *Bird v. Parsons*, 289 F.3d 865, 875 (6th Cir.2002).

■ Where the first two factors are established, an inference arises that the third factor, the reasonableness factor, is likewise met. *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1268 (6th Cir.1996); *American Greetings Corp. v. Cohn*, 839 F.2d 1164, 1170 (6th Cir.1988) (citing *First National Bank of Louisville v. J.W. Brewer Tire Co.*, 680 F.2d 1123, 1126 (6th Cir. 1982)). If all three factors are satisfied, "jurisdiction will be upheld if the facts of the particular case are such that 'maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *American Greetings*, 839 F.2d at 1166–1167 (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

This court must apply these well-established legal and constitutional principles to the specific facts relating to each of the Defendants to determine whether the court's exercise of personal jurisdiction is appropriate in this case.

### *Kenneth Finkelstein and James Salter*

■ Finkelstein and Salter are obviously separate individuals with their own distinctive history of contacts with the United States and with Huffy, but their relevant contacts are sufficiently similar that joint consideration is sensible. The vast majority of jurisdictional facts before the court pertain to the activities of these two defendants in relation to Huffy and the causes of action stemming from that relationship. But the Trustee does not limit his arguments to specific jurisdiction and the court will therefore initially address whether the defendants are properly subject to general jurisdiction.

The limited facts before the court suggest a pattern of conduct by Finkelstein and Salter that might make them amenable to general jurisdiction. Prior to their commercial involvement with Huffy, both men had already proactively availed themselves of the laws of the United States by becoming chief officers and major shareholders of Gen–X Sports, Inc., a Delaware Corporation. We know little of the business activities of this corporation in the United States, but the creation and maintenance of a Delaware corporation is a clear manifestation of their desire to do business in the United States and to "purposefully [avail themselves] of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). Stated negatively, this circumstance is not suggestive of a scrupulous attempt by the defendants to avoid contacts with the United States so as to minimize the chance that they might be subject to litigation there. *See World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). (noting that the purposeful availment requirement "allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit"). Other contacts of the two men, including their meeting with Huffy in April of 2002 at a Huffy board meeting in Ohio to propose the acquisition

of their Gen–X company and their active pursuit of the acquisition of a chain of footwear stores in California in 2003, likewise suggests a lack of regard for political boundaries and jurisdictional choices and an overt willingness to accept the benefits and consequences of doing business in the United States.

Nevertheless, a Delaware incorporation and some unknown degree of commercial activity in the United States by two Canadian citizens does not provide a sufficient basis to permit general jurisdiction. All their other known contacts with the United States pertained to the performance of their duties as officers of the Huffy subsidiaries. Their relationship with Huffy was a significant one involving continuing rights and obligations, but their actual contacts mostly consisted of the routine communications and occasional in person meetings that would be expected of corporate officer status. They did not maintain offices in the United States and were apparently not seeking to directly engage in any substantial commercial activity there.

On somewhat similar facts, involving non-resident defendants having significant ongoing relationships with entities or persons residing in the forum state, courts have declined to find general jurisdiction while at the same time holding specific jurisdiction to be appropriate. For instance, in *Walker v. Concoby,* 79 F.Supp.2d 827 (N.D.Ohio 1999), two Nevada residents published a report written by an Ohio author and distributed by an Ohio company. They were sued in Ohio for copyright infringement and plagiarism. The Nevada residents had traveled to Ohio to negotiate the terms of the distribution and authorship agreements and had engaged in the usual communications to Ohio in furtherance of their enterprise. The court found that the ongoing duties and obligations between the residents and nonresidents of

Ohio together with the dissemination of the allegedly infringing pamphlet in Ohio weighed heavily in favor of specific personal jurisdiction, but not general jurisdiction. *Id.* at 831–833. *See also, Bird,* 289 F.3d at 865 (nonresident internet domain name registration company with no physical Ohio presence but with 4,666 Ohio registrants held subject to specific but not general jurisdiction). Likewise, in the instant case, the contacts of Finkelstein and Salter with the United States are not so "continuous and systematic" as to render them amenable to any lawsuit brought against them in this country.

■ Having determined that they are not subject to general jurisdiction, the court must now consider whether Finkelstein and Salter are subject to specific jurisdiction. The most important issue, and the first factor of the three-part *Southern Machine* test, is whether the two defendants purposefully availed themselves of the privilege of acting in the United States or causing a consequence there. *See Southern Machine,* 401 F.2d at 381. Finkelstein and Salter initiated contact with Huffy to propose a sale of Gen–X when they attended a Huffy Board of Directors meeting in Ohio on April 25, 2002. Initiation of contact, by itself, is not of great consequence, but a *defendant's* choice to consummate the transaction may prove dispositive. *Nationwide,* 91 F.3d at 796. In this case, the original contact resulted in the 2002 Gen–X Transaction by which Finkelstein and Salter became shareholders of Huffy and corporate officers of two Huffy subsidiaries, one Canadian and the other American. Each of the defendants executed Employee Retention Agreements governed by Ohio law. Although their professional responsibilities changed over time, they remained Huffy employees and officers until March 19, 2004. During that time, they had numer-

ous contacts with Huffy in the United States via telephone and email and each of them made some visits to the United States for meetings and trade shows.

Analyzing the defendants' contacts with the forum is not a perfunctory process of adding up the number of phone calls and email messages, or automatically according dispositive weight to physical visits. It is the *quality* of the contacts rather than their *quantity* that matters. *LAK,* 885 F.2d at 1301; *Calphalon Corporation v. Rowlette,* 228 F.3d 718, 722 (6th Cir.2000). In fact, physical contacts with the forum are not essential to personal jurisdiction. *Burger King,* 471 U.S. at 476, 105 S.Ct. 2174; *CompuServe, Incorporated v. Patterson,* 89 F.3d 1257, 1264 (6th Cir.1996). However, even the more insignificant contacts may have a cumulative effect on the court's analysis. *See, e.g., Burger King,* 471 U.S. at 481–482, 105 S.Ct. 2174 (contractual choice of law provision alone insufficient to establish jurisdiction, but is not irrelevant); *LAK,* 885 F.2d at 1300 (place where contractual obligation incurred is factor, but not normally determinative). The most significant contact of Finkelstein and Salter with the United States is their purposeful affiliation with Huffy, an American corporation, as contractual employees and subsidiary officers. Their many communications with Huffy in Ohio, and their occasional travel there, were customary complements of such an affiliation.

A useful comparison is the *Calphalon* case in which the Sixth Circuit Court of Appeals examined a somewhat similar situation and determined that jurisdiction over an out-of-state manufacturer's representative was not tenable. In *Calphalon,* a Minnesota-based corporation and its principal (jointly referred to as "Rowlette") entered into a one year "manufacturer's representative agreement" with Calphalon Corporation, an Ohio corporation, pursuant to which Rowlette became the exclusive sales agent for Calphalon's products in several upper Midwestern states, not including Ohio. The contract contained an Ohio choice of law provision and Rowlette frequently communicated with Calphalon in Ohio and attended two sales meeting there, but owned no property and had no business presence there. The court found Rowlette's contacts with Ohio to be "fortuitous and attenuated" in large part because Rowlette had not "sought to further its business and create 'continuous and substantial' consequences there." *Calphalon,* 228 F.3d at 722–723.

It is important to note that Rowlette was an independent contractor transacting all of its business outside of Ohio and was neither an employee nor subsidiary of Calphalon. It was a purely commercial arrangement by which an outside sales agent sold products produced by Calphalon and was paid commissions to do so. Rowlette's only flagrant availment of the privilege of acting in Ohio or causing a consequence in that state was the agreement itself which happened to be governed by Ohio law.

Our case is very different. Finkelstein and Salter were not independent parties operating in Canada pursuant to a simple contract for sales and commissions. Finkelstein and Salter not only contracted with Huffy in the United States, they actually became part of Huffy. They fully embraced Huffy by becoming not just employees, but officers of Canadian and American subsidiaries. In addition to profiting from the sale of Gen–X to Huffy, they contracted to enhance their wealth with Huffy stock options tied to their performance on behalf of Huffy. Their contracts contemplated a long continuing relationship with Huffy, a relationship they apparently thought would benefit them. *See Southern Machine,* 401 F.2d at 385–

386 (defendant entering into contract contemplating continuing relationship and profits in Tennessee cannot complain if it is subject to jurisdiction there.) Their activities as managers and officers were inexplicably bound to the American corporation and they accepted the benefits of American laws pertaining to corporate governance and securities. It should not have been a surprise to either of them that they might be haled into an American Court on matters pertaining to corporate asset transfers and fiduciary duties of officers.

The situation in this case more closely approximates that in *Burger King.* In that case, the individual Michigan franchisees had very limited contacts with the state of Florida where the franchisor was located. However, the Supreme Court found jurisdiction to be proper in Florida primarily because the dispute arose from a franchise agreement having a "substantial" connection to Florida where the franchisor's main office was located. *Burger King,* 471 U.S. at 479–480, 105 S.Ct. 2174. It would seem that the contractual and legal connections between a parent corporation and the officers of its subsidiary are at least as "substantial" as that between a franchisor and franchisee. The Supreme Court also found it significant that the franchisee with the fewest obvious Florida contacts chose to reach out to that state to realize benefits not available to him as a local enterprise:

> Eschewing the option of operating an independent local enterprise, Rudzewicz deliberately "reach[ed] out beyond" Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization. *Travelers Health Assn. v. Virginia,* 339 U.S., at 647, 70 S.Ct., at 929. Upon approval, he entered into a carefully structured 20-

year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida. In light of Rudzewicz' voluntary acceptance of the long-term and exacting regulation of his business from Burger King's Miami headquarters, the "quality and nature" of his relationship to the company in Florida can in no sense be viewed as "random," "fortuitous," or "attenuated."

*Id.* Certainly, this observation applies equally in this case where Finkelstein and Salter purposefully accepted a long-term relationship with an American business by voluntarily becoming officers of Huffy. Equally apt was the Supreme Court's observation that "the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed." *Id.* at 474, 105 S.Ct. 2174.

Such close ongoing affiliations contrast sharply with those cases where the primary nexus between a foreign defendant and the plaintiff's chosen forum is an isolated or "one-shot" commercial transaction. *See, e.g., Kerry Steel,* 106 F.3d at 151 ("The purchase agreement between Paragon and Kerry Steel represents nothing more than an isolated transaction. . . . There is no indication in the record that Paragon intended to create an ongoing relationship in Michigan with Kerry Steel."); *LAK,* 885 F.2d at 1293. By way of rough analogy, the relationship between the defendants and the forum in cases such as *Kerry Steel* and *LAK* is like casual dating, lacking commitment and continuity, whereas Finkelstein and Salter consummated a marriage with Huffy and became part of the Huffy corporate family subject to the laws of Ohio and the United States. Although subsequently divorced, the defendants cannot disavow the jurisdiction and laws from which they derived professional benefit. Given the quality of their

contacts with Huffy in the United States, the court is satisfied that the first factor of the three-part *Southern Machine* test has been met. The defendants' contacts evidence their purposeful availment of the privilege of acting in the United States or purposefully causing a consequence there.

Continuing the analysis of specific jurisdiction, the second factor of the *Southern Machine* test is that the cause of action must arise from the defendants' activities in the proposed forum. *See Southern Machine*, 401 F.2d at 381. It is evident that the causes of action set forth in the complaint against Finkelstein and Salter, particularly including fraudulent transfer, breach of fiduciary duty, and constructive fraud, are "substantially connected" to defendants' actions as officers of a Huffy subsidiary when they negotiated and consummated the 2004 OPP Transaction in conjunction with the Forzani Agreement. *Southern Machine*, 401 F.2d at 384 n. 27. The factual basis for jurisdiction over the two men is primarily their status and attendant activities as corporate officers of a Huffy subsidiary, and there can be no doubt that the causes of action arise from those same facts. Certainly, two corporate officers should not be surprised to be haled into an American court by the American parent corporation (derivatively through the Trustee) based on their activities as officers in dispensing with major corporate assets.

As discussed earlier, once the first two *Southern Machine* factors have been met, there is an inference that the third is met as well. *CompuServe*, 89 F.3d at 1268. Even without that inference, it is readily apparent that the alleged acts of the defendants and the consequences of those acts have a substantial enough connection with the United States, and especially Ohio, that it is reasonable to require the defendants to submit to jurisdiction there. "Reasonableness" primarily depends upon whether Ohio and/or the United States have an interest in resolving this conflict. *Southern Machine*, 401 F.2d at 384; *Aristech Chemical*, 138 F.3d at 628. Ohio has a strong interest in the interpretation and application of its corporate and commercial laws and in protecting the assets of business enterprises located there. *See American Greetings*, 839 F.2d at 1170 (Ohio has a strong interest in adjudicating Ohio laws affecting Ohio corporations); *CompuServe*, 89 F.3d at 1268 ("Ohio has strong interest in resolving a dispute involving an Ohio company" and applying Ohio law). The United States likewise has a strong interest in enforcing its bankruptcy laws and administering assets of a bankrupt business entity in accordance with those laws. *See In re Federalpha Steel LLC*, 341 B.R. 872, 889 (Bankr. N.D.Ill.2006); *In re Teknek, LLC*, 354 B.R. 181, 204–205 (Bankr.N.D.Ill.2006). It must also be noted that this plaintiff is unlikely to obtain relief anywhere else because resolution of this dispute requires the application of Ohio state law and federal bankruptcy law, matters that a bankruptcy court sitting in Ohio is uniquely qualified to adjudicate.

In assessing the reasonableness of imposing jurisdiction in this instance, some consideration must be paid to the burden on the defendants who reside and are citizens of Canada. *Asahi Metal Industry Co. v. Superior Court of California, Solano County*, 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *Aristech Chemical*, 138 F.3d at 628. However, as expressed by the Sixth Circuit, "a Canadian defendant ... bears a substantially lighter burden than does a Japanese defendant—or for that matter, most other foreign defendants." *Aristech Chemical*, 138 F.3d at 628. The distance between Ontario and Ohio is not great and the legal

system in the United States is somewhat similar to that in Canada. *Id.* at 628–629; *Theunissen,* 935 F.2d at 1462. The balancing of burdens and interests decidedly favors the Trustee. Consequently, it is this court's determination that its personal jurisdiction over Finkelstein and Salter is reasonable.

### Rick White

 The jurisdictional analysis with respect to White is much the same as that for Finkelstein and Salter, except that the relevant facts and correlative minimum contacts are more limited. The only facts before the court pertaining to White relate to his role as a Senior Vice President of Gen–X Sports Canada, Inc., the Huffy subsidiary. *Like Finkelstein and Salter,* White executed an Employment Agreement, but White's agreement was with Gen–X Sports Canada, Inc. rather than directly with Huffy, and was governed by Ontario law instead of Ohio law. He had frequent communications with Huffy, however, including some visits to Huffy in Ohio, and he participated to some degree in the negotiations leading up to the 2004 OPP Transaction. According to his Employment Agreement, he was an officer and employee of a company engaged in the distribution of sporting goods in Canada, Japan, Switzerland and the United States.

Other than White's affiliation with Huffy, there are no other facts before the court that indicate such "continuous and systematic" contacts with the United States that the exercise of general jurisdiction would be justified. *Kerry Steel,* 106 F.3d at 149. Unlike Finkelstein and Salter, there is no evidence that White had any role as an officer of the Delaware subsidiary or that he had ever had any other contact whatsoever with the United States.

 While general jurisdiction may not apply in this instance, specific jurisdiction is entirely appropriate for precisely the same reasons that if was appropriate for Finkelstein and Salter. That analysis need not be repeated here except summarily. By accepting his role as a corporate officer of a Huffy subsidiary and becoming an active component of the Huffy business enterprise, White purposely availed himself of the privilege of acting in the United States or purposefully causing a consequence there. His involvement in the 2004 OPP Transaction on behalf of the purchaser and as an officer of the same OPP Business for Huffy satisfies the second factor of the *Southern Machine* test. The causes of action clearly arise from White's relationship with Huffy and the forum state. And, finally, the exercise of jurisdiction in this instance is patently reasonable. White, an officer of a Huffy subsidiary and an active participant in the negotiation and purchase of major Huffy assets, cannot be surprised to be haled into court by Huffy in Ohio on matters directly related to his activities as an officer and participant in the purchase transaction.

### Osgoode Financial, Inc.

 There is no semblance of an argument that Osgoode should be subject to general jurisdiction. Its known contacts with the United States, if any, are negligible and certainly do not rise to the "continuous and systematic" level necessary to satisfy due process. Specific jurisdiction is likewise problematic given the paucity of contacts with the United States. Essentially, Osgoode was an Ontario corporation controlled by Finkelstein and Salter that had a Supplier Agreement with Gen–X Sports Canada, Inc. (the Huffy subsidiary). That Supplier agreement was abrogated pursuant to Section 8.06 of the 2004 OPP Transaction APA.

Based upon these facts, it is difficult to discern any contacts whatsoever that would constitute "purposeful availment" of anything in the forum state. As the *Nationwide* court made clear, the mere existence of a single contract, such as that between Osgoode and Huffy's Canadian subsidiary, is insufficient:

> The Supreme Court has ... recognized ... that the existence of a contract with a citizen of the forum state, standing alone, will not suffice to confer personal jurisdiction over a foreign defendant. *Burger King,* 471 U.S. at 478, 105 S.Ct. at 2185. Rather, "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing ... must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Id.* at 479, 105 S.Ct. at 2185–86.

*Nationwide,* 91 F.3d at 795.

■ In this case, there are no such facts to evaluate other than the Ohio choice of law provision in the APA. As previously noted, such provisions may be relevant, but are not determinative. *Burger King,* 471 U.S. at 481–482, 105 S.Ct. 2174; *Calphalon,* 228 F.3d at 723. The Trustee places considerable emphasis upon Osgoode's participation in the negotiations leading up to the 2004 OPP Transaction, but all that can be discerned of the substance of those negotiations is one short section of the APA dealing with termination of the Supplier Contract. Even if Osgoode had financed the 2004 purchase, such financing provided by one Canadian corporation to another Canadian corporation would not create any additional evidence of "purposeful availment." That Osgoode was owned or controlled by Finkelstein and Salter who are subject to this court's jurisdiction does not automatically make Osgoode subject to that juris-diction, absent a piercing of the corporate veil. *See Lakota Girl Scout Council, Inc. v. Havey Fund–Raising Management, Inc.,* 519 F.2d 634, 638 (8th Cir.1975). In short, the proposed jurisdiction over Osgoode cannot satisfy the first and most critical factor of the *Southern Machine* test and is unreasonable and untenable under any theory.

### The Forzani Group Ltd.

■ Forzani is a sizable publicly traded company, purportedly the largest sporting goods retailer in Canada. Nevertheless, Forzani and its various affiliated entities have very limited contacts with the United States other than product purchases from Huffy and some other American suppliers. Even these purchases are made primarily through Canadian intermediaries, according to Forzani. That Forzani owns an inactive Delaware corporation adds little to the jurisdictional analysis. *See Dean v. Motel 6 Operating L.P.,* 134 F.3d 1269, 1273–1274 (6th Cir.1998) ("[A] company does not purposefully avail itself by owning all or some of a corporation subject to jurisdiction.").

Perhaps because of this lack of contacts, the Trustee has not presented a coherent argument for general jurisdiction. He does, however, place considerable emphasis upon Forzani's foray into this court in December of 2004 to purchase some of Huffy's assets pursuant to bid procedures and final sale approved by orders of this court. That Forzani availed itself of this court's jurisdiction and legal process to acquire assets is not an insignificant contact with the United States. But it is not determinative. First of all, it was an isolated contact with a single purpose rather than part of some continuous and systematic activity in the United States. Furthermore, Forzani's choice to purchase assets by means of a bankruptcy

court proceeding in Ohio was entirely fortuitous. Forzani came to Ohio because the assets, or at least the means of acquiring the assets, were located there and not because Forzani wanted to exploit a market there or create some other continual and substantial consequences there. Similarly, in the *Calphalon* case, the defendant representative's contacts with Ohio were solely because the manufacturer was headquartered in Ohio, a situation the court described as "precisely the type of 'random,' 'fortuitous,' and 'attenuated' contacts that the purposeful availment requirement is meant to prevent from causing jurisdiction." *Calphalon*, 228 F.3d at 723.

 It is to specific jurisdiction that the Trustee looks for his strongest case, but that too is problematic. Beginning with the critical "purposeful availment" factor, Forzani's most overt contact with the United States and Ohio was its purchase of assets through this court. But, as just discussed, that event does not constitute purposeful availment. Also, it has no obvious relationship to the Trustee's causes of action, making satisfaction of the second factor of the *Southern Machine* test likewise unattainable.

The linchpin of the Trustee's argument is that Forzani was a de facto major participant in the 2004 OPP Transaction. According to the Trustee's view, the 2004 OPP Transaction by which New Gen–X purchased certain assets of Gen–X Sports Canada, Inc., including the OPP Business and the U.S. trademarks, was merely a subterfuge enabling Forzani to acquire the assets by means of the Forzani Agreement. Forzani provided all of the financing to New Gen–X for the asset purchase, and acquired all of the stock of New Gen–X on the day after the 2004 OPP Transaction closed. The problem for the Trustee is that the transaction was exclusively Canadian. Both New Gen–X and Forzani are Canadian corporations. The Forzani Agreement was negotiated, executed, and closed in Canada and pertained to the purchase of stock in a Canadian corporation. Forzani's only contact with Huffy was indirectly through Finkelstein, Salter, and White, all of whom are Canadian citizens and officers of a Canadian corporation.

The Trustee argues that New Gen–X was merely a conduit used by Forzani to acquire the OPP Business from Huffy. He further suggests Forzani was aware that Finkelstein, Salter, and White were fiduciaries of Huffy, and that the "secret" financing of the purchase coupled with the likewise "secret" Forzani Agreement are tantamount to an illicit conspiracy to deprive Huffy of the full value of the OPP Business. Consequently, so the argument goes, the triangular transaction should be collapsed and viewed as a two party transaction between Huffy and Forzani, a transaction that would seemingly qualify as purposeful availment of American laws or at least the purposeful causation of a consequence in the United States.

There are a number of flaws with this argument. First, Forzani owed no duty to Huffy and, based on the facts now before the court, it did nothing illegal or fraudulent. In fact, Forzani may well have adopted a stratagem to avoid jurisdiction in the United States, a course of action that has been inferentially condoned by the Supreme Court. In the *World–Wide Volkswagen* case, the Court stated that the Due Process Clause, and more specifically the purposeful availment requirement, "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World–Wide Volkswagen,*

444 U.S. at 297, 100 S.Ct. 559. That Forzani may have structured its conduct so as to avoid being haled into court in the United States is not reprehensible.

Although the Trustee does not specifically use agency terminology, his argument in effect casts Finkelstein, Salter, and White as agents of Forzani rather than Huffy. Under this theory, the three of them acted on behalf of Forzani in the negotiation and closing of the 2004 OPP Transaction resulting in the "flip" to Forzani a day later. If they were agents of Forzani, their activities might well be attributed to their principal. It is also true that the use of an intermediary does not necessarily shield a foreign party from jurisdiction. *See, e.g., Fortis Corporate Insurance v. Viken Ship Management,* 450 F.3d 214, 220 (6th Cir.2006). However, speculation aside, there is no evidence that Forzani directed the activities of the three men and there are no other facts to support such an agency relationship. Instead, the facts are that Finkelstein, Salter, and White were corporate officers of a Huffy subsidiary, and hence contractual agents of Huffy, and also agents of New Gen–X which made the asset purchase.

According to the Supreme Court, one of the ameliorative effects of the purposeful availment requirement is to ensure that a defendant is not subjected to jurisdiction "solely as a result . . . of the unilateral activity of another party or a third person." *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174 (quoting *Helicopteros Nacionales,* 466 U.S. at 417, 104 S.Ct. 1868). Thus, for very good reason, the Trustee must provide some evidence that Forzani itself has taken some overt action connecting it to the United States. *See Motel 6,* 134 F.3d. at 1273–1274 (evidence that parent corporation had controlling interest in and integrated business relationship with subsidiary subject to jurisdiction held in-

sufficient to show direct involvement in operations, and hence no purposeful availment.).

The Trustee has placed considerable reliance on the *Viken* case, claiming that the *Viken* court held specific jurisdiction to be appropriate on facts less compelling than those of the instant case. Under consideration in that case was whether a United States court had jurisdiction over two defendant Norwegian companies that owned and managed a fleet of cargo vessels, some of which were chartered to a Canadian company. The Canadian charter company subchartered one vessel to an American company for the purpose of transporting steel coils to Toledo, Ohio. In transit, the steel coils were severely rusted which led to the lawsuit filed by an insurance underwriter. In applying the purposeful availment test, the court was impressed by the Norwegian defendants' active cultivation of the American market, particularly the rigging of their vessels specifically to ship to Great Lakes ports, including Toledo, the long-term charter agreement with a Great Lakes shipper, and the frequent calls their ships made to American ports. *Viken,* 450 F.3d at 221–222. In addition, the charter agreement between the defendants and the Canadian company specifically contemplated calling at American ports, including Toledo. *Id.* at 217. In other words, the Norwegian defendants took systematic steps over a significant period of time to deliberately exploit and profit from the American market and "had more than sufficient notice that they might be subject to jurisdiction here, and had ample opportunity to pass on the costs of potential liability . . . or to require that [the charter company] avoid the United States ports completely." *Id.* at 221.

The situation in our case differs dramatically from that in *Viken.* Forzani did not attempt to sell its products in the United

States, affiliate with an American corporation, or overtly avail itself of any privilege of acting there. That Forzani purchased the stock of a Canadian corporation that owned assets that once belonged to another Canadian corporation that was a subsidiary of an American corporation simply does not rise to the level of "purposeful availment." Forzani could not anticipate being haled into an American court on the basis of such a transaction. Consequently, Forzani is not subject to either the general or specific personal jurisdiction of this court.

### Conclusion

For the foregoing reasons, it is hereby **ORDERED** as follows:

A. The Motion to Dismiss filed on July 7, 2006 (doc. 19) by the Finkelstein Defendants is **GRANTED** in part and **DENIED** in part to the following effect:

 i. The court has personal jurisdiction over Defendants Kenneth Finkelstein, James Salter, and Rick White and this action shall remain pending as to them.

 ii. The court does not have personal jurisdiction over Osgoode Financial, Inc. and this action is therefore **dismissed** as to Osgoode.

B. The Motion to Dismiss filed on July 10, 2006 (doc. 23 & 24) by the Forzani Group Ltd. is **GRANTED** and this action is therefore **dismissed** as to Forzani.

**SO ORDERED.**